Raphaela LOZADA, Plaintiff,

v.

Jo Ann BARNHART, Commissioner
of Social Security, Defendant.

No. CIV.A. 02–3666.

United States District Court,
E.D. Pennsylvania.

July 27, 2004.

William C. Haynes, Law Offices of William C. Haynes, Lancaster, PA, for Raphaela L. Lozada, Plaintiff.

Nicholas R. Cerulli, Social Security Administration, Office of the General Counsel, Joyce M.J. Gordon, Social Security Administration, Patricia Anne Stewart, Social Security Administration, Philadelphia, PA, for Jo Anne B. Barnhart, Commissioner of the Social Security Administration, Defendant.

## MEMORANDUM

ROBRENO, District Judge.

This is an appeal from a final decision of the Commissioner of the Social Security Administration denying plaintiff Raphaela Lozada's claim for Supplemental Security Income (SSI). Before this court are the parties' cross motions for summary judgment, a Report and Recommendation of the Magistrate Judge recommending that the court grant Defendant's motion and deny Plaintiff's motion, and Plaintiff's objections to the Magistrate Judge's Report and Recommendation.

Lozada has raised four purported objections,[1] namely that the Magistrate Judge erred in recommending that the ALJ's denial of benefits be affirmed because the ALJ:(1) failed to properly evaluate the severity of Plaintiff's mental impairments; (2) erred in finding that Plaintiff's allegations were not entirely credible based upon Plaintiff's activities of daily living; and (3) failed to investigate and properly analyze all possible reasons for Plaintiff's non-com-

---

1. An examination of the three "objections" filed by Plaintiff reveals that they are, *verbatim,* the same arguments presented to the Magistrate Judge, cut and pasted into a document that now purports to assert "objections" to the Magistrate Judge's Report and Recommendation. Therefore, Lozada's submissions to the court do not comply with the requirements of Local Rule 72.1(IV)(b) that objections specifically identify the portions of the Report and Recommendation to which objection is made.

Under Third Circuit precedent, a failure to comply with the Local Rules empowers the court "to impose a harsh result, such as dismissing a motion or an appeal, when a litigant fails to strictly comply with the terms of a local rule." *United States v. Eleven Vehicles, Their Equipment and Accessories,* 200 F.3d 203, 214 (3d Cir.2000). In order to avoid penalizing Plaintiff for her counsel's conduct, however, the court will construe her objections as directed at the Magistrate Judge's determination that the ALJ's decision should be affirmed. *See id.* at 215 (holding that "a district court can depart from the strictures of its own local procedural rules where (1) it has a sound rationale for doing so, and (2) so doing does not unfairly prejudice a party who has relied on the local rule to his detriment").

pliance with a prescribed course of treatment.

For the reasons that follow, the Court will adopt the Report and Recommendation of the Magistrate Judge, and will grant the Defendant's motion for summary judgment. The Court finds, contrary to Plaintiff's assertions, there is substantial evidence to support the Commissioner's denial of benefits and that the Commissioner committed no error of law in reaching its decision to deny benefits.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Raphaela Lozada was born on April 2, 1979. R. at 16. At the time of the administrative hearing, Lozada was twenty-two (22) years old. *Id.* She has a high school equivalent education but has no past relevant work experience. R. at 16, 18.

Lozada filed for benefits in September 13, 2001 alleging disability since August 1, 2000, as a result of anxiety, memory loss, inability to concentrate, depression, and fear of being around people. R. at 80. Her claim was denied initially and a request for a hearing was timely filed. R. at 11. After a hearing, Administrative Law Judge Reana L. Sloniger denied Lozada's claim for SSI benefits on February 2, 2002. R. at 19. The Appeals Council subsequently denied Ms. Lozada's request for review, R. at 4, and the Commissioner adopted the Appeals Council's decision, making the ALJ's decision the final decision of the Commissioner. Plaintiff then filed the instant action in federal court seeking judicial review of the Commissioner's decision.

## II. DISCUSSION

### A. *"Substantial Evidence" Standard*

█ The role of the court is to determine whether the Commissioner's findings of fact are supported by "substantial evidence." 42 U.S.C. § 405(g); *Jesurum v.*

*Sec'y of U.S. Dep't of Health & Human Services*, 48 F.3d 114, 117 (3d Cir.1995) (citing *Brown v. Bowen*, 845 F.2d 1211, 1213 (3d Cir.1988)). Substantial evidence is defined as " 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.' " *Jesurum*, 48 F.3d at 117 (quoting *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). "It is less than a preponderance of the evidence, but more than a mere scintilla." *Id.* (citing *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420).

█ The search for substantial evidence "is not merely a quantitative exercise." *Kent v. Schweiker*, 710 F.2d 110, 114 (3d Cir.1983). Rather the "administrative decision should be accompanied by a clear and satisfactory explication of the basis on which it rests." *Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir.1981), *reh'g denied*, 650 F.2d 481 (3d Cir.1981). "A single piece of evidence will not satisfy the substantiality test if the [Commissioner] ignores, or fails to resolve, a conflict created by countervailing evidence." *Kent*, 710 F.2d at 114.

The court's review of the Magistrate Judge's Report and Recommendation is de novo. 28 U.S.C. § 636(b). Therefore, the court "may accept, reject or modify, in whole or in part," the Magistrate Judge's findings and recommendations. *Id.* In considering claimant's objection to the Magistrate Judge's ruling, the court has independently reviewed the entire record, including the Report and Recommendation, the ALJ's written decision, the transcript of the hearing, the hearing exhibits, and relevant medical documentation.

### B. *Establishing Eligibility for SSI*

In order to qualify for SSI, a claimant must show that he suffers from a disability as under the Social Security Act, which defines "disability" as:

inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months . . . [The impairment must be so severe that the claimant] is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.

42 U.S.C. §§ 423(d)(1)(A), (d)(2)(A).

 The Commissioner has established a five-step inquiry for determining whether a claimant is eligible for disability benefits under the Act. To prevail, a claimant must establish (1) that he is not engaged in substantial gainful activity, and (2) that he suffers from a severe medical impairment. *See Jesurum,* 48 F.3d at 117 (citing *Bowen v. Yuckert,* 482 U.S. 137, 140–41, 107 S.Ct. 2287, 96 L.Ed.2d 119 (1987)). If the claimant shows these two elements, the Commissioner determines (3) whether the impairment is listed by the Secretary as one creating a presumption of disability. *Id.* If the claimant's medical impairment is not "listed," the claimant bears the burden of proving that (4) the impairment nonetheless prevents him from performing the work that he has performed in the past. *Id.* The relevant inquiry is "whether the claimant retains the residual functional capacity to perform [his] past relevant work," *Fargnoli v. Massanari,* 247 F.3d 34, 39 (3d Cir.2001). If the claimant satisfies this burden, the Secretary must grant him benefits unless the Secretary can demonstrate (5) that there are jobs in the national economy that the claimant can perform. *Jesurum,* 48 F.3d at 117 (citing *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985)).

### C. *The ALJ's Decision*

As recounted by the Magistrate Judge, the ALJ concluded at step two of the sequential analysis that Plaintiff suffered from two medically determinable impairments, anxiety and depression, which resulted in "more than a minimal degree of limitation in [Plaintiff's] ability to perform basic work activities" and were therefore severe within the meaning of the regulations. R. at 14. The ALJ concluded, however, that neither of those impairments, "considered singly or in combination, are of sufficient severity to meet or medically equal any of the impairments listed in Appendix 1, Subpart P, Regulations No. 4." R. at 14, 18.

The ALJ concluded that, although Plaintiff had no past relevant work, Plaintiff retained the residual functional capacity to perform a limited range of work at all exertional levels "despite occasional difficulties with following directions, concentration, memory, depressed mood, hallucinations, and anxiety." R. at 18. The ALJ found that, despite those difficulties, Plaintiff was able to understand, remember, and carry out simple instructions, make simple work-related decisions, respond appropriately to others and usual work situations, and handle changes in routine work settings. *Id.* Therefore, because the ALJ found that Plaintiff could be expected to adjust to work existing in significant numbers in the national economy (as testified to by the vocational expert), the ALJ concluded that Plaintiff was not disabled. *Id.*

### D. *The Magistrate Judge Did Not Err in Concluding that the ALJ's Decision that Plaintiff Suffered From Only Two "Medically Determinable" Severe Impairments Is Supported By Substantial Evidence.*

Plaintiff first contends that ALJ Sloniger failed to properly evaluate the severity

of Plaintiff's mental impairments because she ignored (i.e., did not consider) medical evidence in the record which indicated that Plaintiff's Global Assessment of Functioning (GAF)[2] scores fluctuated widely and that Plaintiff suffered from mental impairments other than depression and anxiety, namely: paranoia and hallucinating (R. at 198); schizophrenic disorder (R. at 199); bipolar, manic, with psychosis (R. at 201); major depressive disorder with psychotic features, possible dysthymic disorder, possible attention deficit hyperactive disorder, possible conduct disorder, and possible personality disorder (R. at 103) and anorexia nervosa and possible obsessive compulsive disorder (R. at 208). Plaintiff argues that, because certain GAF scores and other medical evidence was not mentioned specifically in the ALJ's decision, the ALJ failed to consider all of the evidence in the record.

 In determining whether a claimant is entitled to disability benefits, "[t]he ALJ must consider all the evidence and give some reason for discounting the evidence she rejects." *See Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir.1999). Although

the ALJ need not make reference to every relevant piece of information in the record, she must "consider and evaluate the medical evidence in the record consistent with [her] responsibilities under the regulations and case law." *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir.2001). A reviewing court must be able to determine whether "significant probative evidence was not credited or simply ignored." *Id.*

 In the instant case, Plaintiff contends that the ALJ failed to consider the following evidence in the record: (1) Plaintiff's voluntary admission to Lancaster General Hospital on April 17, 2001 with a GAF score of 30; (2) Plaintiff's hospitalization in 1995 when she was sixteen years old (and related GAF scores); (3) Plaintiff's on-going counseling and medication for depression in 2000 and 2001; and (4) a progress note from Dr. Wendy Bisset indicating that Plaintiff had a medical history of depression and anorexia nervosa, and that Plaintiff suffered from possible obsessive compulsive disorder. Upon review of the ALJ's decision, it is apparent that evidence cited above by Plaintiff falls into a number of categories. Some evidence cit-

---

**2.** The Global Assessment of Functioning (GAF) Scale is used to rate an individual's overall psychological, social, and occupational functioning. *Diagnostic and Statistical Manual of Mental Disorders (DSM–IV–TR)* 32 (4th ed.2000). The GAF scale ranges from 0 to 100 and is divided into 10 ranges of functioning, requiring the examiner to pick a value that best reflects the individual's overall level of functioning using either symptom severity or functioning. *Id.* at 32, 34. Each range can be described as follows: a GAF score in the range 31–40 indicates "some impairment in reality testing or communication (e.g., speech is at times illogical, obscure, or irrelevant) OR major impairment in several areas such as work, school, family relations, judgment, thinking or mood;" a GAF score of in the range of 41–50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or

school functioning (e.g. no friends, unable to keep a job);" a GAF score in the range of 51–60 indicates "moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR moderate difficulty in social, occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers);" a GAF score in the range of 61–70 indicates "some mild symptoms (e.g. depressed mood and mild insomnia) OR some difficulty in social, occupational or school functioning (e.g. occasional truancy or theft within the household), but generally functioning pretty well, has some meaningful interpersonal relationships;" a GAF score in the range of 71–80 indicates, "if symptoms are present, they are transient and an expectable reaction psychosocial stressors (e.g., difficulty concentrating after family argument; no more than slight impairment in social, occupational, or school functioning (e.g., temporarily falling behind in schoolwork))." *Id.* at 34.

ed by Plaintiff as not considered by the ALJ was in actuality mentioned by the ALJ in her decision and either credited or not credited. However, other evidence was not referred to at all in the ALJ's decision. Each category of evidence will be discussed below.

### 1. *Plaintiff's April 17, 2001 Hospitalization*

First, Plaintiff contends that, although the ALJ's decision refers to Plaintiff's hospitalization at Lancaster General Hospital in April of 2001, the ALJ failed to consider all of the evidence surrounding that hospitalization, and instead focused on the fact that at discharge Plaintiff had a GAF score of 55 (which reflects only moderate symptoms or moderate difficulties with social or occupational functioning). Specifically, Plaintiff contends that the ALJ failed to consider that, when Plaintiff was voluntarily admitted to on April 17, 2001 because she was paranoid and hallucinating, she had a GAF score of 30 and was diagnosed with schizophrenic disorder.[3] R. at 198–99.

It is clear from the ALJ's decision, however, that the ALJ considered all of this evidence. The ALJ's decision notes that, although Lozada had voluntarily committed herself for psychiatric treatment in April of 2001 with complaints of paranoia and hallucinating, Plaintiff tested positive for marijuana at that time and "upon discharge, she was not hallucinating, her paranoia was in better control, and she had a GAF of 55." R. at 14; *see also* R. at 201–02. Thus, the ALJ apparently gave Lozada's April 2001 hospitalization and the diagnoses which arose from that hospitalization (i.e., schizophrenic disorder and bipolar disorder) little weight in determining the extent of Plaintiff's mental impair-

ments because of Plaintiff's drug use, the lessening of Plaintiff's psychotic symptoms (i.e., paranoia and hallucinations), and the increased GAF score at discharge. *See* R. at 15.

Furthermore, the diagnoses of bipolar disorder and schizophrenic disorder were inconsistent with the findings of the psychiatrist or psychologists who had treated or evaluated Plaintiff prior to and after the April 2001 hospitalization in which those diagnoses arose. Prior to Plaintiff's hospitalization on in April of 2001, on November 17, 2000, Lozada met with Dr. Herbert Cooper, M.D. who diagnosed Plaintiff with depressive disorder with anxious features and concluded that psychotherapy would be "the key piece in [Lozada's] treatment." R. at 153–54. At that time, Plaintiff's GAF score was 73. R. at 154. Dr. Cooper met with Lozada again on December 29, 2000 and March 16, 2001 and concluded that Plaintiff was not someone with "Major Depressive Disorder." R. at 192.

On February 1, 2001, Lozada was evaluated by Dr. John Laguna, Ph.D. a consultative examiner for the Pennsylvania Bureau of Disability Determination, who described Plaintiff as being "largely within normal limits with regards to anxiety," R. at 155. Dr. Laguna also noted that Plaintiff was cooperative, not suicidal, able to perform significant activities of daily living (i.e., shopping, cooking, cleaning, paying bills, and personal care), and her remote memory and past memory were within normal limits. R. at 165. Although Plaintiff's "[a]bstract thinking ranged from fair to poor" and her concentration was poor, Dr. Laguna concluded that Plaintiff had a GAF score of 60. R. at 156–57. Dr. Laguna diagnosed Plaintiff with post traumatic distress disorder

---

**3.** At discharge, Plaintiff's GAF score was 55 and she was diagnosed with "bipolar, manic, with psychosis." R. at 201.

(in connection with Plaintiff's sexual assault at age 16) and dysthymic disorder. R. at 157.

On February 20, 2001, a state agency consultant, Dr. Lois Poloni, Ph.D., concluded that Plaintiff was "able to effectively engage in appropriate personal care," R. at 161, and diagnosed Plaintiff with affective disorders (i.e. dysthymia) and anxiety-related disorders. R. at 163, 166. Dr. Poloni further concluded that Plaintiff's complaints of not being able to focus and or concentrate were "not wholly credible" because Plaintiff was able to complete tasks requiring focus (i.e., driving, laundry) and she could adequately concentrate to perform specific tasks (i.e., child care and vacuuming). R. at 177.

Further, after Plaintiff's hospitalization in April of 2001, Lozada met with Dr. Cooper on three more occasions (i.e., June 8, 2001, June 15, 2001, and June 29, 2001). Dr. Cooper noted that he was somewhat surprised by Plaintiff's symptoms associated with her hospitalization (i.e., psychotic episodes with paranoid features and "hallucinosis") and found the diagnosis of bipolar psychosis to be "uncertain."[4] R. at 224. He further noted that the use of illicit drugs were involved in Plaintiff's symptoms but the extent to which they played a role was uncertain. *Id.* After his meeting with Lozada on June 15, 2004, Dr. Cooper further noted that Plaintiff did not "present psychotic features that characterized her recent hospitalization" and discounted the diagnosis of "Bipolar, Schizoaffective or Schizophreniform illness" because Plaintiff did not have the "residual or interepisode features that would characterize those major diagnosis."[5] R. at 226. Additionally, Lozada did not show any overt psychotic features during her meeting with Dr. Cooper on June 29, 2004. R. at 227. Dr. Willis Goodenow, who replaced Dr. Cooper, noted after a session with Lozada on August 9, 2004 that Plaintiff had advised him that she was doing well, and was not suffering from sleeping problems, any other medical problems, or depression.[6] R. at 228. The findings made by Dr. Cooper, Dr. Laguna, Dr. Poloni, and Dr. Goodenow were summarized by the ALJ in her decision.

Thus, because the diagnoses resulting from Plaintiff's hospitalization in April 2001 (i.e., bipolar disorder and schizophrenic disorder) and the psychotic symptoms exhibited by Plaintiff during that hospitalization are inconsistent with the other medical evidence in the record, and are affected by (if not caused by) Plaintiff's drug use, the ALJ gave little weight to this evidence. Furthermore, to the extent Plaintiff has alleged in her claim for disability benefits that she still suffers from paranoid thoughts (i.e., thoughts that other people are against her), R. at 80, a finding that Plaintiff suffers from the additional mental impairments of bipolar disorder and schizophrenic disorder cannot be

---

4. Similarly, after reviewing Plaintiff's Discharge Summary from Lancaster General Hospital, Dr. Cooper wrote in his progress notes that he was "surprised" by the hospitalization and diagnoses based on the visits that Plaintiff had with him. R. at 224. Dr. Cooper remarked that, prior to her hospitalization, "at no time did she show Schizophreniform features or give [him] a history that suggests a Bipolar Disorder with psychosis." *Id.* He further considered that "hysterical psychosis" as a result of her "personality situa-

tion, pregnancy, and use of marijuana" might be an explanation. *Id.*

5. Dr. Cooper wondered whether the stress of being pregnant and possibly losing her Section 8 housing contributed to a "reactive psychosis, as opposed to her having Bipolar, Schizoaffective or Schizophreniform illness." R. at 226.

6. Notably, Plaintiff had missed two prior scheduled appointments with Dr. Goodenow on July 24, 2004, and July 31, 2001.

based solely on Plaintiff's symptoms. *See* SSR 96–4p, 1996 WL 374187, *2 (S.S.A. July 2, 1996)("No symptom or combination of symptoms by itself can constitute a medically determinable impairment."). Because there is no medical evidence supporting Plaintiff's claim that she suffers from bipolar disorder and schizophrenic disorder outside of the April 2001 hospitalization, and the progress notes from Dr. Cooper after the April 2001 hospitalization contradict the diagnoses that Plaintiff suffers from either of those disorders, the ALJ did not err in concluding that Plaintiff does not suffer from these additional impairments.

2. *Plaintiff's December 1995 Hospitalization*

Plaintiff next argues that the ALJ failed to consider evidence in the record concerning Plaintiff's hospitalization in 1995. The ALJ's decision states that Plaintiff has been hospitalized for treatment of her mental impairments only once, on April 17, 2001. R. at 15. This is an apparent error since Plaintiff's medical records indicate that she was hospitalized on December 20, 1995 at the age of 16 as a result of a suicide attempt. R. at 111. Plaintiff was evaluated for four days based upon the initial diagnosis of major depression, single episode (rule out dysthymic disorder) and a GAF score of 35–40. R. at 112. Plaintiff's diagnosis upon discharge was major depressive disorder with psychotic features (rule out, dysthymic disorder, early onset; rule out attention deficit hyperactivity disorder; rule out conduct disorder,

adolescent onset; rule out personality order) and she had a GAF score of 45.[7] R. at 103.

Plaintiff argues that the ALJ's misstatement that Plaintiff only required inpatient treatment on one occasion indicates that the ALJ failed to consider the 1995 hospitalization when determining the severity of Plaintiff's mental impairments. However, this is not the case. Although the 1995 hospitalization was not mentioned specifically in the ALJ's written decision, the ALJ did briefly question Plaintiff about that hospitalization when Plaintiff testified at the hearing. R. at 264–65. Moreover, Plaintiff's admission and discharge records in connection with her hospitalization in 1995 are apart of the administrative record.[8] R. at 102–115. Thus, because the ALJ specifically stated that she based her determination that Plaintiff was not disabled upon a review of the *all the evidence of record* (R. at 11) and she referred to the 1995 hospitalization during her examination of Plaintiff, it is reasonable to conclude the ALJ considered Plaintiff's 1995 hospitalization when evaluating Plaintiff's mental impairments.

Evidence of Plaintiff's hospitalization in 1995 was likely not referred to by the ALJ in her decision because the diagnoses made at Plaintiff's discharge from the hospital in 1995, i.e. major depressive disorder with psychotic features, single episode (rule out, dysthymic disorder, early onset; rule out attention deficit hyperactivity disorder; rule out conduct disorder, adolescent onset; rule out personality order), are not supported by the record. As stat-

7. Although defendant argues that the importance of this hospitalization to the ALJ's determination of the severity of Plaintiff's mental impairments was properly discounted because there is evidence that Plaintiff was using drugs at the time, R. at 224, the discharge summary from the December 1995 hospitalization states that Plaintiff's toxic drug screen was negative at the time

of admittance. R. at 4. Thus, this hospitalization cannot be dismissed solely on that basis.

8. Plaintiff's hospitalization as an adolescent is also mentioned in Dr. Poloni's notes in the Psychiatric Review Technique Form. R. at 175.

ed above, after treating Plaintiff over a period of four months, Dr. Cooper concluded on March 16, 2001 that Plaintiff was not someone with "Major Depressive Disorder." R. at 192. Furthermore, the *possible* diagnoses of attention deficit hyperactive disorder, conduct disorder, or personality disorder which were made at the time of her discharge were not later substantiated during any subsequent psychological evaluation of Plaintiff.[9] There is no other evidence in the record that confirms that Plaintiff suffered from any of those disorders. Therefore, the ALJ did not err in finding that Plaintiff does not suffer from major depressive order, attention deficit hyperactive disorder, conduct disorder, or personality disorder.[10]

Furthermore, Plaintiff's GAF scores of 45 and 35–40 during her 1995 hospitalization do not alter the analysis of the severity and functional limitations of Plaintiff's depression and anxiety. The ALJ concluded that, based on Plaintiff's impairments, Plaintiff had only "mild restriction in activities of daily living, moderate difficulties with social functioning, [and] moderate difficulties in maintaining concentration, each of extended duration." R. at 15, 159–60. Thus, the ALJ concluded that Plaintiff's impairments did not meet or equal any of the impairments listed in Section 12.04 or 12.06 of Appendix 1 of the Regulations, each requiring *marked* functional limitations in those areas. R. at 15; 20 C.F.R. pt. 404, subpt. P, App. 1 (Listing of Impairments). Those findings are supported by the record, particularly: (1) Dr. Laguna's evaluation of Plaintiff, and (2) the opinion of Dr. Poloni, the state agency consultant; and (3) the progress notes from Plaintiff's treating physician Dr. Cooper. In his report, Dr. Laguna reported that Plaintiff's activities of daily activities were within normal limits, her ability to get along with family, friends, and neighbors ranged from within normal limits to fair, and that her concentration, persistence, and pace ranged from fair to poor. R. at 156. Dr. Laguna further concluded that Plaintiff's ability to do work related activities was predominately fair and that Plaintiff's ability to understand, remember, and carry out simple job instructions was good. R. at 157.

Similarly, Dr. Poloni concluded that, despite Plaintiff's mental impairments, Plaintiff was able to "effectively engage in appropriate self care," as well as cook, do laundry and vacuuming independently, and drive. R. at 161. In terms of social functioning, Dr. Poloni concluded that Plaintiff had a "moderate impairment for dealing with large groups of people" and had some "difficulty in trusting authority figures [and] dealing with criticism." R. at 161.

9. Dr. Poloni did opine that Plaintiff suffered from dysthymia, which Dr. Poloni characterized as an affective disorder under section 12.04 of the listings of mental impairments in Appendix 1. R. at 166. Dysthymia can be defined as a "mood disorder characterized by depression." *American Heritage Dictionary of the English Language* (4th Ed.). In adopting Dr. Poloni's findings, the ALJ apparently subsumed the diagnosis of dysthymia within her more general conclusion that Plaintiff suffered from the mental impairment depression, which the ALJ concluded also fell within section 12.04 of the listings of mental impairments in Appendix 1. *See* R. at 15. In any event, it is clear from the ALJ's decision that she concluded that Plaintiff's depression and related symptoms did not satisfy the requirements of a listed impairment under section 12.04.

10. Plaintiff's 1995 hospitalization may also be discredited on the basis of drug use. Based on Dr. Cooper's notes, there is some evidence in the record that Plaintiff was using drugs at the time of her hospitalization in 1995. R. at 224. However, that fact remains uncertain since Plaintiff's discharge report states that Plaintiff's toxic drug screen, presumably performed upon admission to the hospital, was negative. R. at 103.

With respect to concentration, persistence, and pace, Dr. Poloni concluded that Plaintiff was able to "understand and follow simple task instructions ... make decisions, keep appointments with her doctors," and had only a "moderate impairment for sustained concentration and tasks requiring detailed and complex understanding." R. at 161–62. Overall, Dr. Poloni concluded that Plaintiff was not significantly limited in most areas of work-related activities. R. at 159–62.

Lastly, although Plaintiff's physician Dr. Cooper did not issue a report addressing Plaintiff's impairments in terms of the categories of functioning listed in the Regulations, his progress notes notably do not contain any indication that Plaintiff's mental impairments resulted in more than moderate difficulties in Plaintiff's daily activities, social functioning, or concentration, persistence, or pace. Thus, the evidence of record overwhelming indicates that Plaintiff suffers from no more than *moderate* limitations functioning.[11] As such, the ALJ's findings as to severity of Plaintiff's impairments are supported by substantial evidence in the record.

Moreover, although Plaintiff's GAF scores in the range of 35–40 and 45 during her four-day hospitalization in 1995 indicate that Plaintiff presented serious symptoms (e.g. suicidal ideation) or major impairments in areas such judgment, thinking, and mood at that time, that instance of lower GAF scores *four years* prior to the date that Plaintiff alleges she became disabled would not alter the ALJ's findings based upon all of the other evidence in the record indicating Plaintiff only suffered from moderate limitations in functioning. Because evidence of Plaintiff's 1995 hospitalization is therefore not significant for all the reasons stated above, the court concludes that the ALJ did not err in failing to refer to the 1995 hospitalization in her decision.

### 3. *Ongoing Counseling and Progress Note*

Plaintiff argues that the ALJ erred in failing to consider medical evidence of record that indicates that (1) Plaintiff received on-going counseling from August 31, 2000 through September 25, 2000 from Lancaster General Hospital (R. at 116–

---

**11.** The only contrary conclusion in the record as to the severity of Plaintiff's impairments is that of the social worker, Kathleen Taddonio, M.S.W., L.W. After reviewing Plaintiff's medical records, Ms. Taddonio, submitted a report on behalf of the Action Review Group, Inc. that Plaintiff was unable to perform basic work related functions and that her mental impairments met the severity criteria defined the Social Security Regulations. R. at 58. She also reported that Dr. Ronald Refice, M.D. of Action Review Group, Inc., after review of Plaintiff's Social Security file, similarly concluded that Plaintiff's condition satisfies the criteria of section 12.04 and 12.06 of the Listing of Impairments for Affective and Anxiety Disorders (respectively), based on his assessment that Plaintiff's anxiety resulted in "deficits in concentration, persistence, or pace, deficits in socialization skills, and episodes of decompensation despite treatment" which is necessary under Section 12.06. R.

at 55, 58. The ALJ concluded, however, that Ms. Taddonio, a social worker, was not an acceptable medical source under the Regulations. R. at 15; *See* 20 CFR § 416.913(a). The ALJ did not address Ms. Taddonio's assertion that her conclusion as to the severity of Plaintiff's impairments was echoed by Dr. Refice.

In any event, the conclusions expressed by Ms. Taddonio are inconsistent with the evidence of record, particularly the progress reports from Dr. Cooper, the evaluation of Dr. Laguna, and the opinion of the state agency psychologist, Dr. Poloni. Because the clinical findings made by those mental health professionals and Plaintiff's lack of intensive or extensive treatment contradict Ms. Taddonio's assessment (and that of Dr. Refice who did not examine Plaintiff) was properly given little weight by the ALJ. Notably, Plaintiff has not objected to the lack of weight given to Ms. Taddonio's report.

123);[12] (2) Plaintiff was prescribed medication for depression from her primary physician Dr. Jeffrey T. Trost, M.D. from July 5, 2000 to September 26, 2000 (R. at 125–26);[13] (3) Plaintiff received counseling and medication monitoring from Lancaster County MH/MR from August 30, 2000 to August 9, 2001 (R. at 218–28),[14] and (4) Plaintiff had a medical history of depression, anorexia nervosa and possible obsessive compulsive disorder (R. at 208).[15]

At the outset, the court notes that, although most of the evidence cited above was not specifically referred to by the ALJ in her decision, there is no evidence that this evidence was not considered by her in making her findings. The failure of the ALJ to cite specific evidence does not necessarily establish that the such evidence was not considered. *Black v. Apfel,* 143 F.3d 383, 386 (8th Cir.1998); *see also Phillips v. Barnhart,* 91 Fed.Appx. 775, 777 n. 7, 2004 WL 474139, *2 n. 7 (3d Cir.2004).

To the contrary, this particular evidence was likely not mentioned by the ALJ because it is not particularly significant to any of the ALJ's findings. The evidence that Plaintiff received counseling from August 31, 2000 to September 25, 2000, a period of less than a month, and was treated for depression by her primary physician Dr. Trost is not weighty evidence which would change the ALJ's analysis as to the severity of Plaintiff's mental impairments. In fact, it is cumulative of the ALJ's finding that, to treat Plaintiff's depression and anxiety, she had been prescribed a generally conservative course of treatment consisting primarily of medications.[16] R. at 14. Plaintiff does not suggest in her ob-

---

**12.** On August 30, 2000 Plaintiff began counseling with Marilyn Banks, M.S.W. at the Lancaster Guidance Center. Based on her initial evaluation Banks concluded that Plaintiff suffered from depression and anxiety and showed some symptoms of bipolar mood disorder. R. at 123. She diagnosed Plaintiff with dysthymic disorder (possible bipolar disorder) with a GAF score of 50. *Id.* During the following month, Banks saw Plaintiff on three other occasions (September 8, 2000, September 14, 2000, and September 25, 2004), making the additional finding on September 25, 2004 that, although Plaintiff had paranoidal thoughts, it was unclear whether her thoughts were psychotic or from low self-esteem, and that she did not see psychosis anywhere else. R. at 116. Ms. Banks, however, did not diagnose Plaintiff with any additional impairments not already in the record.

**13.** Dr. Trost prescribed Prozac and Paxil for Plaintiff for her depression. R. 125–26. Although Dr. Trost notes that Plaintiff may have been diagnosed with bipolar disorder at age 16 (which is not supported elsewhere in the record), and that Plaintiff at times experienced mood swings and "social phobia" he made no specific diagnoses that Plaintiff suffered from any disorder aside from depression. *Id.*

**14.** In actuality, this evidence was discussed by the ALJ through her discussion of the evaluation of Plaintiff by Dr. Cooper (who monitored Plaintiff's medication through Lancaster County MH/MR). R. at 14. Because the evidence of counseling received by Plaintiff at Lancaster County MH/MR from August 30, 2000 to August 9, 2001 is in actuality the same as Dr. Cooper's progress notes (which were clearly considered and discussed by the ALJ), this portion of Plaintiff's objection is unfounded.

**15.** At Plaintiff's one and only visit to Walter Aument Health Center on April 4, 2001, Dr. Wendy Bisset evaluated Plaintiff over a period of fifteen minutes. R. at 208. Dr. Bisset noted that Plaintiff had a history of depression and anorexia nervosa. *Id.* Notably, however there is no support in the record that Plaintiff has been diagnosed with anorexia. She diagnosed Plaintiff with possible OCD (obsessive compulsive disorder), noting that because she had only had fifteen minutes with Plaintiff she had not had an opportunity to complete a full evaluation for OCD. R. at 209. However, there is no evidence in the record that Plaintiff followed up with Dr. Bisset. As such, no conclusive diagnosis was made that Plaintiff suffered from OCD.

**16.** Although Plaintiff was still adjusting her medication to control her symptoms at the

jections how this evidence is particularly significant.

Dr. Bisset's progress note is similarly insignificant since it is cumulative of the ALJ's finding that Plaintiff's suffers from depression and it merely relates Plaintiff's own statements that she has a history of anorexia, a diagnosis not found in Plaintiff's medical records. Moreover, Dr. Bisset was unable to definitively diagnose Plaintiff with obsessive compulsive disorder because Plaintiff's visit was only fifteen (15) minutes. R. at 208–09. It is important to note, however, that none of this evidence consists of findings contrary to the findings upon which the ALJ based his conclusion as to the severity of Plaintiff's impairments. As stated above, the ALJ need not mention every piece of relevant evidence in the record. *See Fargnoli,* 247 F.3d at 42. Thus, because the evidence of on-going counseling and treatment for depression and the progress note by Dr. Bisset was hardly worthy of note, the Court concludes that the ALJ did not err in not referring to it in her decision.

For the above reasons, the court concludes that the ALJ's finding that Plaintiff suffered from only two medically determinable severe impairments, anxiety and depression, is supported by substantial evidence.

E. *Magistrate Judge did not Err in Concluding that the ALJ Properly Used Lozada's Daily Activities as an Indicator of Lozada's Credibility*

▮ In assessing the severity of Plaintiff's mental impairments, the ALJ

concluded that Plaintiff's allegations concerning the intensity, duration and limiting effects of her symptoms were not entirely credible, in part, because they were incompatible with Plaintiff's statement that she is able to care for her two young children and her younger brother.[17] R. at 14, 261. In determining the credibility of an individual's subjective complaints of pain and other symptoms, the ALJ must consider "the entire case record, including the objective medical evidence, the individual's own statements about symptoms, statements and other information provided by treating or examining physicians or psychologists and other persons about the symptoms and how they affect the individual, and any other relevant evidence in the case record." SSR 96–7p, 1996 WL 374186, at *1 (S.S.A. Jul. 2, 1996). In the course of this inquiry, however, "[the] ALJ must give serious consideration to a claimant's subjective complaints ..., even where those complaints are not supported by objective evidence." *Mason v. Shalala,* 994 F.2d 1058, 1067 (3d Cir.1993) (citing *Ferguson v. Schweiker,* 765 F.2d 31, 37 (3d Cir.1985)); *see also* SSR 96–7p, 1996 WL 374186, at *1 ("An individual's statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms have on his ... ability to work may not be disregarded solely because they are not substantiated by objective medical evidence.").

▮ The ALJ concluded that the objective medical evidence established that Plaintiff's medically determinable impairments—depression and anxiety—could

---

date of the last entry by her primary physician, R. at 125, by August 9, 2001 Plaintiff was on steady medication and reported to Dr. Goodenow that she was sleeping well and had no feelings of depression. R. at 228. Notably, Plaintiff was not in counseling at that time. R. at 266–67.

17. Although there is evidence in the record that Lozada had been taking care of her younger brother (since the date in which she alleges she became disabled), R. at 152, 155, at the time of the hearing before the ALJ, Lozada stated that only her two young children (ages 3 and 4) and her younger sister (age 15) were residing with her. *See* R. at 253–54.

reasonably be expected to produce her symptoms (i.e. constant anxiety and depression, inability to focus on task or follow directions, fear of being around people, difficulty sleeping, and paranoia). R. at 13. However, in evaluating the credibility of Plaintiff's subjective complaints regarding the severity of those impairments, the ALJ relied in part on evidence of the extent of Plaintiff's daily activities of caring for her two children and a younger brother.[18] R. at 14. The ALJ specifically noted that Plaintiff was able "to cook, clean and do other routine household activities such as laundry and vacuuming." R. at 13. Plaintiff does not disagree that Plaintiff's daily activities may properly be considered in evaluating her subjective complaints as to the severity of her mental impairments. *See* SSR 96–7p, 1996 WL 374186, at *3 (stating that when assessing the credibility of an individual's statements as to her symptoms, the adjudicator may consider evidence of individual's daily activities). Plaintiff argues, however, that Plaintiff's particular daily activities are not proper indicators of her credibility in light of the Third Circuit's decision in *Smith v. Califano*, 637 F.2d 968 (3d Cir.1981).

In *Smith*, the Third Circuit reversed the District Court's grant of summary judgment in favor of the Secretary, concluding that the ALJ improperly discounted the claimant's allegations of severe pain as a disability because of the claimant's statements that "he had full use of his hands, arms and legs, does shopping and last fall went hunting twice." *Id.* at 971. The Court concluded that disability was not negated by shopping for the necessities of life or by "sporadic or transitory activity." *Id.* As such, the Court found the sporadic nature of Smith's activities (shopping and hunting twice) was evidence of his *inability* to engage in substantial gainful activity. *Id.* (emphasis added). Although not stated directly, Plaintiff appears to argue that her daily activities are similarly "sporadic and transitory."

*Smith,* however, is distinguishable from the case at bar. In *Smith,* the claimant's allegations of disabling pain were supported by the medical evidence in the record (i.e., a letter and report from Smith's treating physician). *Id.* at 971. Because the Secretary had presented no contradictory evidence, the claimant's testimony as to the severity of his pain therefore remained unrebutted. *Id.* The Third Circuit therefore concluded that, because the Secretary had failed to give appropriate consideration to the *unrebutted medical evidence* that the claimant's ulcer condition rendered him disabled and to the claimant's *own testimony of severe pain,* the Secretary's decision that the claimant did not suffer from a disability was not supported by substantial evidence. *Id.* at 970 (emphasis added).

However, as noted by the Magistrate Judge, in the instant case the record does not contain "unrebutted medical evidence" that Lozada's impairments are disabling. To the contrary, in evaluating Plaintiff's allegations as to the severity of her mental impairments, the ALJ reviewed the objective medical evidence in the record which did not support Plaintiff's claims. R. at 14. Specifically, the ALJ pointed to the evidence of Plaintiff's mental health provider's conservative course of treatment (consisting primarily of medications that have proven effective in regulating the

18. The ALJ also found that Plaintiff's allegations as to the degree of limitation posed by her mental impairments were undercut by several other factors, including the generally conservative course of treatment prescribed by her doctors, her non-compliance with tak- ing her medical prescriptions, her failure to follow recommended therapies (i.e. counseling and group counseling) and her use of marijuana despite her knowing that it conflicted with her medication. R. at 14.

claimant's symptoms) (*see* R. at 150–54, 191–92, 222–28), Plaintiff's GAF ratings which ranged between 55 and 73 (*see* R. at 154, 157, 201), and the lack of impressive findings on her mental status examination by Dr. Laguna (*see* R. at 155–158) as all undercutting Plaintiff's allegations of the severity of her symptoms.[19] *Id.* Moreover, in addition to the objective medical evidence, the ALJ found that Plaintiff's subjective complaints were further undercut by Plaintiff's own testimony of her non-compliance with taking her medical prescriptions (*see* R. at 267–68), her failure to follow recommended therapies (i.e. counseling and group counseling) (*see* R. at 266–67, 268–69) and her drug use despite knowing that it interfered with her medication (R. at 276–77).[20] *Id.* Based on that analysis, the court finds that in making her credibility determination, the ALJ engaged in an adequate discussion of all the evidence and fully articulated her reasons for finding Plaintiff not to be fully credible.

Therefore, because there was a factual basis in the record in which the ALJ could reject Plaintiff's allegations as to the severity of her impairments, and Plaintiff's allegations were effectively rebutted by the objective medical evidence in the record as well as her own testimony, the ALJ's conclusion that Plaintiff's statements as to the severity of her mental impairments were not entirely credible is supported by substantial evidence.[21]

**F.** *The Magistrate Judge Did Not Err in Concluding that the ALJ Properly Used Lozada's Non–Compliance with Prescribed Course of Treatment in Evaluating Plaintiff's Credibility*

■■■ As mentioned in Part E above, the ALJ concluded that Plaintiff's allegations as to the severity of her symptoms were further undercut by her failure to comply with taking her medical prescriptions, her failure to follow recommended therapies (which included counseling), as well as her use of marijuana.[22] R. at 14. Plaintiff argues, however, that in considering Plaintiff's non-compliance with her prescribed treatment the ALJ failed to properly consider whether her non-compliance was jus-

---

**19.** As mentioned in Part D above, Plaintiff's allegations as to the severity of her impairments are also undercut by the evidence in the record that as whole indicates that Plaintiff's mental impairments do not pose more than moderate limitations to Plaintiff's activities of daily living, her social functioning, or her concentration, persistence, or pace.

**20.** Plaintiff has objected to the ALJ's use of Plaintiff's non-compliance with prescribed treatment to undercut her credibility. However, the Court overrules this objection in Part F below.

**21.** Moreover, *Smith* can also be distinguished because, as the Magistrate Judge concluded, Plaintiff's daily activities are not "sporadic and transitory." On a daily basis, Lozada cares for her two young children as well as a younger sibling. R. at 253. Plaintiff is also able to cook and do household chores including cleaning, laundry, and vacuuming. R. at 70, 156, 161. Caring for two young children

and maintaining her home on a daily basis can hardly be described as sporadic activity.

**22.** At the hearing Plaintiff admitted that: (1) although counseling and group therapy was recommended upon Plaintiff's discharge from Lancaster General Hospital in May of 2001, she had not signed up or started any counseling or group therapy as of six months after her discharge. R. at 266, 268. Plaintiff stated that she had not done so because of child-care issues, although she admitted that she had not taken any steps to make any child care arrangements with her family so that she could go to counseling. R. at 269. Plaintiff further admitted that, although she was taking her medication at the time of the hearing, prior to her hospitalization in April of 2001 she had stopped taking her medication because they made her tired. R. at 268. It is not clear from her treating physician's progress notes, whether Plaintiff reported any side effects of the medication to her treating physician.

tified as is required under Social Security Ruling 82–59.

Ruling 82–59 provides:

"Where the treating source has prescribed treatment clearly expected to restore ability to engage in [substantial gainful activity (SGA) ], but the disabled individual is not undergoing such treatment appropriate development must be made to resolve whether the claimant ... is justifiably failing to undergo the treatment prescribed.... The claimant ... should be given an opportunity to fully express the specific reason(s) for not following the prescribed treatment."

SSR 82–59, 1982 WL 31384, at *2 (S.S.A. 1982). The Ruling further provides:

[The] SSA may make a determination that an individual has failed to follow prescribed treatment only where the following conditions exist:

1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA), or in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P ...

Id. at *1. Thus, SSR 82–89 only applies where the ALJ has determined that an individual's impairments preclude her from engaging in substantial gainful activity, i.e. an individual who would otherwise be found to be disabled under the Act. See 42 U.S.C. § 423(d)(1)(A)(defining "disability" under the Social Security Act as "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment"). In the instant case, because the ALJ found that Plaintiff does not have a disabling impairment, Ruling 82–59 is not applicable here. See also Thomas v. Barnhart, No. 02–2958, 2003 WL 21419154, *5 (E.D.Pa. June 11, 2003)(finding SSR 82–59 did not apply to a individual who was found not to have a disabling impairment); Rothrock v. Massanari, No. 00–4912, 2001 WL 881450, *5 (E.D.Pa. June 12, 2001)(finding SSR 82–59 inapplicable to the ALJ's credibility determination because the claimant's impairments did not preclude her from engaging in substantial gainful activity).[23] Therefore, because the ALJ committed no legal error in considering Plaintiff's non-compliance with her medication or her physician's counseling recommendations and Plaintiff's drug use in assessing Plaintiff's credibility, Plaintiff's objection on this basis is overruled.

## III. CONCLUSION

For the foregoing reasons, the court adopts and approves the Report and Recommendation of Magistrate Judge Hart. Summary judgment is granted in favor of defendant, Commissioner of Social Security, and against Plaintiff, Raphaela Lozada.

An appropriate order follows.

### ORDER

**AND NOW**, this 27th day of **July, 2004**, upon consideration of the pleadings and the record herein, and after review of the Report and Recommendation of United States Magistrate Judge Jacob P. Hart, and plaintiff's objections, it is hereby **ORDERED** that:

---

**23.** The ALJ did not otherwise err in considering Plaintiff's noncompliance with her medication and her physician's counseling recommendations or her drug use when assessing Plaintiff's credibility since the adjudicator is directed to consider evidence of the type of medication (including its effectiveness and side effects) that the claimant takes, other treatment the claimant receives for her symptoms, and any other factors that might precipitate the claimant's symptoms when evaluating a claimant's statements as to the severity of her impairments. See SSR 96–7p, 1996 WL 374186, at *3.

1. The Report and Recommendation (doc. no. 19) is **APPROVED** and **ADOPTED**.
2. The plaintiff's motion for summary judgment (doc. no. 16) is **DENIED**.
3. The defendant's motion for summary judgment (doc. no. 17) is **GRANTED**.

**AND IT IS SO ORDERED.**