**Luz D. RAMOS, Plaintiff,**

v.

**Jo Anne B. BARNHART, Commissioner of Social Security, Defendant.**

**Civil Action No. 06–1457.**

United States District Court, E.D. Pennsylvania.

March 30, 2007.

John S. Whitelaw, Community Legal Services, Inc., Philadelphia, PA, for Plaintiff.

Joyce M.J. Gordon, Social Security Administration, Sandra Romagnole, Office of General Counsel SSA, Philadelphia, PA, for Defendant.

### Memorandum and Order

YOHN, District Judge.

Plaintiff Luz D. Ramos appeals the decision of the Commissioner of Social Security ("the Commissioner") denying her claim for supplemental security income ("SSI") under Title XVI of the Social Security Act ("the Act"). Ramos and the Commissioner have filed cross motions for summary judgment (now titled in the Clerk's standard procedural order as a Request for Review and Response). I referred the motions to United States Magistrate Judge Thomas J. Rueter, who submitted a report and recommendation that I grant the Commissioner's motion and affirm the Commissioner's decision. Ramos has filed objections to the report and recommendation. The Commissioner has not filed a response. For the following reasons, this court will approve and adopt the magistrate judge's report and recommendation, grant the Commissioner's motion for summary judgment, and deny Ramos's motion for summary judgment.

### I. Factual Background

Ramos, born on April 12, 1961, was forty-four years old at the time of her hearing before an Administrative Law Judge ("ALJ"). (R. 94, 347.) She was fifty-eight inches tall, weighed approximately 117 pounds and was left-handed. (*Id.* at 347.) Ramos has lived in the United States since she was thirteen years old. (*Id.* at 349.) She did not finish tenth grade, and could not read, write or speak in English, but had some ability to understand it. (*Id.* at 19, 217, 348–50.) Ramos last worked in a chicken factory in the early 1980s, and stopped working in 1982 to raise her children. (*Id.* at 350.) Ramos lived at home with her disabled husband, who received SSI disability payments, and her two grown children. (*Id.* at 348.) Ramos's other source of income was welfare. (*Id.* at 348.)

### A. Mental Impairments

Ramos has a history of out-patient mental health treatment that started when she received a psychiatric evaluation at the Nueva Vida Behavioral Health Center ("Nueva Vida") on December 12, 2001. (R. 332–36.) The evaluating psychiatrist diagnosed Ramos with major depressive disorder and recommended counseling and medication. (*Id.* at 336.) Ramos's treatment progress notes from late 2001 to late 2003 reveal nine visits following her initial evaluation, each visit lasting approximately twelve minutes. (*Id.* at 337–40.) Ramos's treatment ended on December 23, 2003, when Ramos disagreed with her psychiatrist about the addictive nature of Ativan. (*Id.* at 341.)[1] With the exception of dry mouth on one occasion (*id.* at 340), Ramos did not report any medication side effects in any of these visits. Her mood and affect in these visits varied from tense, angry, anxious, depressed, and nervous to less anxious and less depressed. (*Id.* at 327–40.) Her interactions ranged from isolated to less isolated. (*Id.* at 339.)

Ramos's medical records do not show any mental health treatment in 2004. On April 12, 2004, Ramos underwent a one-time clinical psychology disability evalua-

---

**1.** According to the treatment notes of Ramos's psychiatrist, Ramos requested more Ativan, which her psychiatrist did not prescribe due to its addictive qualities. (R. 341.) The notes show Ramos "argue[d]" for more Ativan, stating "I know I don't [] get addicted." (*Id.* (quotations omitted).)

tion by Loren Laviolette, Ed.D. (R. 183–87.) Ramos reported that she shopped with her son's assistance and that she sometimes cooked and cleaned, but would stop cleaning when she became tired. (*Id.* at 184.) She stated that she could make her own decisions, and that she coped with the help of her therapist, psychiatrist, and husband. (*Id.*) Ramos also revealed that she got along with her children and sometimes with her neighbors, and that she had two friends. (*Id.*) She admitted that when conflicts arose, she tended to argue. (*Id.*) Further, she claimed that she had never been fired. (*Id.*)

On April 19, 2004, J.J. Kowalski, M.D., completed a Mental Residual Functional Capacity Assessment and a Psychiatric Review Technique. (R. 188–205.) Dr. Kowalski opined Ramos had problems with depression and anxiety that were being treated by out-patient therapy and medication. (*Id.* at 190.) Dr. Kowalski assessed mild restrictions on her activities of daily living. (*Id.* at 190, 202, 204.) Dr. Kowalski reported that Ramos was capable of performing "adequate ADL's" (activities of daily living) or "a variety of routine, non-complex tasks," such as self-care. (*Id.* at 190.) Dr. Kowalski observed that while Ramos is "sensitive to how people treat her," Ramos can follow instructions and communicate clearly. (*Id.*)

Ramos resumed her mental health treatment in January 2005. In January 2005, Ramos underwent routine comprehensive bio-psychosocial evaluations at Asociacion de Puertorriquesnos en Marcha, Inc. ("APM") for her depression, lack of sleep, and emotional problems. (R. 214–24, 226–28.)[2] On January 14, 2005, an evaluating psychiatrist diagnosed Ramos with major depressive disorder, and noted Ramos's mood and affect as constricted, anxious, and depressed. (*Id.* at 227.) The psychiatrist assessed Ramos with a global assessment of functioning ("GAF") score of 52.[3] (*Id.*) The APM evaluation dated January 24, 2005 reflected no psychiatric hospitalizations. (*Id.* at 215.) Ramos reported that her current financial situation was "good." (*Id.* at 220.)

Ramos's 2005 treatment progress notes show six hour-long visits. (R. 324–28, 330.) Her psychotherapist assessed her as depressed, insecure, nervous, and anxious. (*Id.*) Ramos also appeared alert, oriented, cooperative, logical, and well-groomed. (*Id.*) Her psychotherapist did not find her to be suicidal or a danger to others. (*Id.*) Treatment plans included reducing her level of anxiety (*id.* at 326); resolving her financial issues (*id.* at 325); stabilizing her mood (*id.* at 327); and continuing psychotherapy (*id.* at 328). In her February, March and April 2005 visits, Ramos reported struggling with her medications' side effects, which included swallowing problems and stomach pains. (*Id.* at 324, 328, 330.) Consequently, her treatment

2. The record contains pages one through eight, twelve, thirteen of an adult biopsychological evaluation completed by Blanca Salazar on January 24, 2005. (R. 214–24.) The record also contains pages nine through eleven of an adult bio-psychological evaluation completed by a different doctor on January 14, 2005. (*Id.* at 226–28.)

3. The ALJ noted that Ramos's GAF score of 52 had been noted in treatment records dated March 8, 2005. (R. 26.) However, Ramos's GAF score appears in a bio-psychological evaluation dated January 14, 2005 (*id.* at 227).

A global assessment of functioning score of 51 to 60 indicates moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social occupational, or school functioning (e.g. few friends, conflicts with peers or coworkers). American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th Ed.2000).

goals also included making sure all her medication was taken as prescribed and with food (*id.* at 328), and determining which medication offered the fewest side effects (*id.* at 330).

## B. Physical Impairments

On July 8, August 19, and September 16, 2002, Ramos visited the Temple University Health Sciences Center with complaints of pain in her left hand and forearm. (R. 152–54.) She had been previously diagnosed with fibromyalgia and arthritis, and was taking Darvocet. (*Id.* at 154.) She was assessed with possible DeQuervains and received such treatment as injections, use of a hand splint, and Naprosyn, all of which offered some relief. (*Id.* at 152–54.)

On September 16, 2002, Ramos also visited her primary care physician at APM and reported that she had been experiencing shoulder and neck pain for the past "two weeks." (R. 255.) She repeated these complaints to her APM doctor in March and April 2003. (*Id.* at 251–50.) On April 11, 2003, Ramos visited La Fortaleza Physical Therapy Centers ("La Fortaleza") upon her primary care physician's referral. (*Id.* at 164.) Ramos received a diagnosis of "left shoulder pain." (*Id.* at 164.) According to her functional mobility assessment, she pushed, pulled, lifted, and did overhead activities "with difficulty," but she was able to walk, take the stairs, rise from a supine position to standing "without difficulty." (*Id.* at 168.) Upon examination, her left shoulder demonstrated an active range of motion within normal limits, or "WNL." (*Id.* at 165.) Her manual muscle test, or "MMT," assigned her a 3+ grade to her upper left extremity. (*Id.* at 167.) Her treatment plan included various therapeutic exercises and electrical stimulation, and her rehabilitation potential was noted as "good." (*Id.* at 167.) The physical therapist scheduled four weeks of therapy, three times a week. (*Id.*) Ramos completed only seven sessions. (*Id.* at 161–63.)

On August 4, 2003, Ramos visited the Temple University Hospital Department of Orthopaedic Surgery ("Temple"). (R. 322.) Again, she complained of left shoulder pain, but denied weakness and reported that she "is able to wash her hair [and] reach above her head." (*Id.*) The orthopedist recommended steroid injections followed by six weeks of physical therapy. (*Id.*)

Ramos returned to La Fortaleza for a shoulder re-evaluation on September 8, 2003, five months after her initial evaluation. (R. 159–60.) She presented with decreased range of motion in her left shoulder but an increased grade in her manual muscle test. (*Id.* at 160.) Her treatment plan included reducing her shoulder pain with four weeks of physical therapy, three times a week. (*Id.*) After four weeks, Ramos would be re-evaluated to assess her progress. (*Id.*) Ramos visited La Fortaleza only six additional times, with her last visit occurring on October 1, 2003. (*Id.* at 155.) On October 30, 2003, Ramos was discharged because she had not attended physical therapy since the beginning of that month. (*Id.*) Ramos did not return to La Fortaleza after she was discharged.

On February 23, 2004, Ramos was evaluated by Javad Abdollahian, M.D., a consultative examiner. (R. 177–82.) Dr. Abdollahian observed "no limitation in flexion and extension in any joints including wrists, knees and neck." (*Id.* at 179.) Dr. Abdollahian commented that "on movement of the upper extremities, [Ramos] was complaining of shoulder pain and neck pain." (*Id.*) He opined that her grip was "very normal" and her range of motion was "all normal." (*Id.*) He also noted that she picked a pencil off the floor with no

difficulty "in spite of complaining of back abnormality." (*Id.*)

Ramos returned to Temple on August 5, 2004, one year after her initial consult, for a re-evaluation for her left shoulder pain. (R. 319–20.) The chart note stated that she had received injections in the previous year and "had good pain relief for about 1–2 weeks." (*Id.* at 319.) The chart note also reported "[s]he is improved but continues to have weakness and the inability to comb her hair and do any overhead activities." (*Id.*) Ramos claimed she did not finish her physical therapy regimen due to an increase of pain. (*Id.* at 321.) On that day, Ramos received a radiographic examination of her left shoulder that showed no fracture or dislocation and revealed a calcification/spur adjacent to the lateral acromion. (*Id.* at 320.)

### C. Ramos's Testimony

At her hearing before the ALJ, Ramos testified that she visited Nueva Vida for a period of time to treat her depression and nerves. (R. 351.) She stopped attending Nueva Vida in late 2003 because when she had mentioned to her therapist that her medications were not working, the therapist told her she was not trying hard enough to "concentrate." (*Id.*) Ramos did not recall having a disagreement with her therapist about the addictive properties of Ativan. (*Id.* at 351–52.) Ramos did not return to Nueva Vida in 2004. (*Id.* at 352.) She stopped taking her medications while looking for a new therapist. (*Id.*) She started visiting APM,[4] where she was treated "well" and started new medications which helped her somewhat. (*Id.* at 352–53.) She testified that when the medications "run through my system, I can't concentrate and I may become aggressive,

nervous and I don't want to do things." (*Id.* at 353.)

When asked about her activities at home, Ramos testified that she cleaned and did other household tasks. (R. 353.) She stated that once she started, she did not always "complete things." (*Id.*) She reported that on some days, she woke up with "a lot of energy" but on others, her energy level was low. (*Id.* at 356–57.) She also prepared meals, but not "like I used to." (*Id.*) She testified that after she fixed her breakfast, she might go back to bed if she felt tired. (*Id.* at 356.) Ramos claimed to have no friends and that she spent all of her time at home, where she did not often speak to her husband. (*Id.* at 354.) She also shopped with her sons and enjoyed watching Spanish television. (*Id.* at 357, 359.) She did not know how to drive and did not use public transportation because she "always walk[ed] to get my medicines and that's been working fine." (*Id.*) She had difficulties remembering to pay the bills on time and to take her medications. (*Id.* at 358.)

Ramos also testified about the pain in her left shoulder area. (R. 354–55.) She reported receiving shots for the pain at Temple, which helped reduce the inflammation, but that she stopped treatment. (*Id.* at 354.) Ramos claimed she could only walk three to four blocks due to the pain and inflammation in her leg. (*Id.* at 355.) She stated that her back hurt "a little bit" when she sat down. (*Id.*) When asked about her ability to stand, she responded "[s]ince I'm so hyper, I may be up and down all day long. And then if I need to rest, I sit up and I might sit down to rest because that's what I need." (*Id.*) She

---

4. The record reveals that Ramos's visits to APM for mental health treatment began in January 2005. (R. 214–24, 226–28.)

stated that the most she could lift was about ten pounds. (*Id.*)

### D. Testimony of the Vocational Expert

A vocational expert ("VE"), Patricia Scott, testified at the hearing. (R. 360–65.) The ALJ asked the VE to consider the following hypothetical individual:

All right, so we have an individual who is 42 to 43 years of age, who's had a limited education and is not able to write in English or read in English. And has only a very limited ability to understand English but can communicate in English. This individual has no past work experience. However, this individual has an exertional limitation for light work, occasional postural activities. The individual should avoid reaching above shoulder level with the left upper extremity. If in addition, the individual would have sufficient attention in concentration to understand, remember and follow simple instructions and perform routine non complex tasks. And should work in an environment which has only occasional interaction with the general public. And occasional interaction with co-workers. With the individual working primarily alone, would the individual be able to do any work in our regional or national economies?

(*Id.* at 360–61.) The VE opined that an individual with the above limitations could work as a small parts assembler, hand packer, and stock checker. (*Id.* at 361.) The VE stated that these jobs would require no interaction with the public and very limited interaction with co-workers. (*Id.* at 364.) The ALJ then asked what work would be available if an individual could "only frequently use her left upper extremity for handling" and not "completely." (*Id.* at 361.) The VE responded that this individual would be precluded from the aforementioned jobs because they required "constant" use of the left and right upper extremity. (*Id.* at 362.)

## II. Procedural Background

Ramos applied for SSI on September 2, 2003, alleging disability as of April 1, 2002. (R. 18, 94–97.) Ramos alleged disability due to her depression, mental problems, fatigue, arthritis, diabetes, and anxiety. (*Id.* at 99.) The application was denied on April 29, 2004, and Ramos timely requested a hearing. (*Id.* at 18, 41–46.) A hearing took place before an ALJ on April 13, 2005. (*Id.* at 344–66.) At the hearing, Ramos requested that her application be amended to reflect an alleged date of disability onset of September 2, 2003, which the ALJ granted. (*Id.* at 18.) Ramos and her attorney, John S. Whitelaw, and a VE, Patricia Scott, appeared at the hearing.

On April 29, 2005, the ALJ issued a decision finding Ramos not disabled under the Act and denying Ramos SSI. (R. 12–31.) The ALJ determined that Ramos had "medically determinable diabetes mellitus, hypertension, arthritis, left shoulder pain, and depression impairments which are severe in nature, and which could reasonably result in the symptoms as alleged." (*Id.* at 30.) The ALJ found that Ramos's impairments did not meet or equal one of the listed impairments in the regulations (*id.*), and that Ramos's assertions regarding the severity of her impairments were not fully credible (*id.*). With regard to Ramos's mental impairment, the ALJ concluded that Ramos showed a mild degree of limitation in her activities of daily living "because she is able to cook and clean her living abode, albeit with assistance" (*id.* at 23); a moderate degree of limitation in her social functioning; a moderate degree of limitation in her concentration, persistence and pace; and, no episodes of decompensation (*id.* at 23–24.)

Next, the ALJ concluded that Ramos retained the residual functional capacity to perform a restricted range of light exertional work. (R. 30–31.) Specifically, Ramos was "unable to perform postural activities with more than occasional regularity; should avoid reaching above shoulder level with her left arm; has sufficient attention and concentration to understand, remember and follow simple instructions; can perform routine, non-complex tasks; can interact with the general public and with co-workers with no more than occasional frequency; and should work primarily alone." (*Id.*) Even though Ramos was unable to perform the full range of light exertional work, the ALJ found Ramos capable of making an adjustment to jobs which exist in significant numbers in the national and regional economies, such as small parts assembler, hand packer, and stock checker. (*Id.* at 31.) Accordingly, the ALJ concluded Ramos was not "disabled" as defined by the Act. (*Id.*)

Ramos requested review of the ALJ's decision by the Appeals Council. That request was denied on February 3, 2006 (R. 5–7), thereby making the ALJ's decision the final decision of the Commissioner. On April 6, 2006, Ramos sought judicial review pursuant to 42 U.S.C. §§ 405(g) and 1383(c) from this court, and both parties moved for summary judgment. In her motion for summary judgment, Ramos argued that: (1) substantial evidence does not support the ALJ's conclusion that Ramos's mental impairments do not meet or equal the requirements of the listings (Pl.'s Mot. Summ. J. Mem. 5–14); (2) the ALJ improperly found that Ramos was capable of performing light work with restrictions (*id.* at 14–19); and (3) the ALJ's credibility determination is not supported by substantial evidence (*id.* at 19–21). The government countered that substantial evidence supports the decision of the ALJ. (Def.'s Mot. Summ. J. Mem. 2–16.) I referred the case to Magistrate Judge Rueter who issued a comprehensive report and recommendation that summary judgment be granted in favor of the Commissioner. (Rep. & Recom. 1.) Ramos filed objections to the report and recommendation on December 26, 2006. The government has not filed a response. For the following reasons, I will affirm the report and recommendation of the magistrate judge, grant the Commissioner's motion for summary judgment, and deny Ramos's motion for summary judgment.

## III. Legal Standards

■ I review *de novo* the parts of the magistrate judge's report and recommendation to which Ramos objects. 28 U.S.C. § 636(b)(1) (c). I may accept, reject, or modify, in whole or in part, the magistrate judge's findings or recommendations. *Id.*

■ In contrast, a district court may not review the Commissioner's decision *de novo*. The court may only review the Commissioner's final decision to determine "whether that decision is supported by substantial evidence." *Hartranft v. Apfel,* 181 F.3d 358, 360 (3d Cir.1999) (citing 42 U.S.C. § 405(g)). "[S]ubstantial evidence is more than a mere scintilla." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456 (1951) (internal quotation omitted). "Substantial evidence 'does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Hartranft,* 181 F.3d at 360 (quoting *Pierce v. Underwood,* 487 U.S. 552, 565, 108 S.Ct. 2541, 101 L.Ed.2d 490 (1988)). In making this determination, the court must consider "the evidentiary record as a whole, not just the evidence that is consistent with the agency's finding." *Monsour Med. Ctr. v. Heckler,* 806 F.2d

1185, 1190 (3d Cir.1986). The substantial evidence test is "deferential." *Id.* Consequently, the court "will not set the Commissioner's decision aside if it is supported by substantial evidence, even if [the court] would have decided the factual inquiry differently." *Hartranft,* 181 F.3d at 360.

Before a district court can review the record to determine if the Commissioner's final decision is supported by substantial evidence, the Commissioner must provide an explanation for his findings in order to allow for meaningful judicial review. *Burnett v. Comm'r of Soc. Sec.,* 220 F.3d 112, 119 (3d Cir.2000) (holding that an ALJ must "set forth the reasons for his decision"). The ALJ cannot simply state a conclusion "without identifying the relevant listed impairments, discussing the evidence, or explaining his reasoning." *Burnett,* 220 F.3d at 119–120. The Third Circuit has stated that "we need from the ALJ not only an expression of the evidence [he] considered, but also some indication of the evidence which was rejected" in order to determine "if significant probative evidence was not credited or simply ignored." *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir.1981). Without such information, the ALJ's findings are "beyond meaningful judicial review." *Burnett,* 220 F.3d at 119; *see also Cotter,* 642 F.2d at 705–06. Without the ability to meaningfully review the ALJ's conclusions, a court is compelled to "vacate and remand the case for a discussion of the evidence and an explanation of the reasoning supporting" those conclusions. *Burnett,* 220 F.3d at 120.

To determine if a claimant is disabled, the Commissioner applies a five-step process of evaluation under 20 C.F.R. § 404.1520. The first two steps of the analysis involve threshold determinations of whether the claimant is working, 20 C.F.R. § 404.1520(a), and whether the claimant's impairment is of required duration and severity to significantly limit his or her ability to work, 20 C.F.R. § 404.1520(c). The third step is comparing the evidence of medical impairment against a list of impairments that would permit the claimant to qualify for disability without further inquiry. 20 C.F.R. § 404.1520(d). If the claimant does not qualify for benefits automatically according to this list, the Commissioner proceeds to the fourth and fifth steps of the analysis. In the fourth step, the Commissioner determines whether the claimant retains the residual functional capacity to perform work similar to that which he or she has performed in the past. 20 C.F.R. § 404.1520(e). In the fifth and final step, if the Commissioner finds that the claimant is unable to perform any other work that exists in the national or regional economies, she must find the claimant to be disabled. 20 C.F.R. § 404.1520(f); *see also Sullivan v. Zebley,* 493 U.S. 521, 525, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990) (expounding on the application of this five-step process).

## IV. Discussion

Ramos presents this court with two objections to the report and recommendation. First, Ramos contends that substantial evidence does not support the ALJ's assessment of her mental impairments. (Obj.'s to Rep. & Recom. 4–9.) Second, Ramos argues that substantial evidence does not support the ALJ's finding that her shoulder impairment only resulted in a limitation on overhead reaching. (*Id.* at 9–14.)[5] Because I conclude that the ALJ's findings and decision are supported by substantial

---

**5.** Ramos does not object to the report and recommendation's finding that substantial evidence in the record supports the adverse credibility determination of the ALJ. Thus, I adopt that portion of the report and recommendation.

evidence from the record, I will overrule Ramos's objections.

### A. Whether Ramos's Mental Impairments Met or Equaled the Listing Requirements of § 12.04

█ In her first objection, Ramos claims that the ALJ erred in concluding Ramos did not meet or equal § 12.04 of the listing for mental impairments for the following two reasons. First, Ramos contends that substantial evidence does not support the ALJ's conclusion that Ramos has only mild limitations in activities of daily living. (Obj.'s to Rep. & Recom. 7–9.)[6] Second, Ramos disagrees with the report and recommendation's affirmance of the ALJ's treatment of her 2005 medical records for therapy sessions following Ramos's filing date for disability payments. (Obj.'s to Rep. & Recom. 6.) Specifically, Ramos complains that the ALJ failed to consider her recent mental health history and that the ALJ's reliance on Ramos's GAF score of 52 to conclude that Ramos's mental impairments were no more than moderate was unsupported. (*Id.* at 6–7.) The report and recommendation concluded that substantial evidence supports the ALJ's determination that Ramos did not meet the listing requirements of § 12.04. This court agrees.

Section 12.04 refers to affective disorders characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. Mood is a prolonged emotion that colors the claimant's whole psychic life and generally involves either depression or elation. *Id.* In order to meet § 12.04, a claimant must satisfy the criteria of subparts A and B of the listing.[7] *Id.* Subpart B refers to a claimant's capacity to function in the following four relevant spheres: (1) activities of daily living; (2) social functioning; (3) concentration, persistence or pace; and (4) episodes of decompensation. 20 C.F.R. pt. 404, subpt P., app. 1, § 12.00(C)(1)-(4). A claimant satisfies subpart B if she demonstrates two "marked" limitations or one "marked" limitation and repeated episodes of decompensation.[8] 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.04. The regulations offer the following explanation of "activities of daily living:"

> Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for your grooming and hygiene, using telephones and directories, and using a post office. In the context of your overall situation, we assess the quality of these activities by their independence, appropriateness, effectiveness, and sustainability. We will determine the extent to which you are capable of initiating and participating in

---

6. Ramos does not object to the report and recommendation's conclusion that substantial evidence supported the ALJ's determination that Ramos did not have marked limitations in the areas of social functioning and concentration, persistence or pace. Accordingly, I adopt these portions of the report and recommendation.

7. The parties do not dispute that Ramos meets the Subpart A requirements of § 12.04, which refer to specific symptoms, signs, and laboratory findings necessary to establish the mental impairment. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(A).

8. The regulations define "marked" as "more than moderate but less than extreme." For instance, "[a] marked limitation may arise when several activities or functions are impaired, or even when only one is impaired, as long as the degree of limitation is such as to interfere seriously with [the claimant's] ability to function independently, appropriately, effectively, and on a sustained basis." 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00(C).

activities independent of supervision or direction.

We do not define "marked" by a specific number of different activities of daily living in which functioning is impaired, but by the nature and overall degree of interference with function. For example, if you do a wide range of activities of daily living, we may still find that you have a marked limitation in your daily activities if you have serious difficulty performing them without direct supervision, or in a suitable manner, or on a consistent, useful, routine basis, or without under interruptions or distractions.

20 C.F.R. pt. 404, subpt P., app. 1, § 12.00(C)(1).

■ The Third Circuit has clarified that "it is well established that sporadic or transitory activity does not disprove disability." *Smith v. Califano*, 637 F.2d 968, 971–72 (3d Cir.1981). Having a disability does not mean that "a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Id.* at 971; *see also Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir.2001) ("The fact that a claimant is able to engage in limited daily activities, such as washing dishes, doing laundry, and cooking meals does not necessarily demonstrate that she is not disabled.").

Here, the ALJ's finding that Ramos had a mild degree of limitation in her activities of daily living is supported by the record. Dr. Kowalski, a qualified medical consultant specifically trained in the evaluation of medical factors related to disability issues, opined that Ramos was capable of performing "adequate ADL's" (activities of daily living) or "a variety of routine, noncomplex tasks," such as self-care. (R. 190.) [9] The ALJ noted that Dr. Kowalski reached his conclusion by referencing specific medical findings and that Dr. Kowalski cited specific limitations consistent with the record as a whole. (*Id.* at 23.) Further, Dr. Kowalski's observations are not inconsistent with Ramos's treatment that, as the ALJ noted, was "conservative" in nature (*id.* at 23) and included counseling and medication (*id.* at 328, 330, 336). Nor does Dr. Kowalski's determination contradict Ramos's medical records which reflect her ability to care for herself. (*Id.* at 324–28, 330.) Even though the ALJ gave greater weight to Dr. Kowalski's report, the ALJ also pointed to Dr. Laviolette's "specific observation that the claimant performs a variety of household chores [albeit with assistance], has friends and gets along with neighbors." (*Id.* at 23.) [10] Finally, as the ALJ observed, no treating medical source had provided an opinion concerning Ramos's specific mental limitations. (*Id.* at 27.)

9. While Dr. Kowalski did not treat Ramos, state agency doctors are "highly qualified physicians and psychologist who are also experts in Social Security disability evaluation." 20 C.F.R. § 416.927(f)(2)(I).

10. Dr. Laviolette opined that Ramos had marked to extreme limitations with respect to understanding, remembering and carrying out instructions, interacting with supervisors and co-workers and the public, and with responding appropriately to work pressures. (R. 186.) The ALJ granted little weight to Dr. Laviolette's assessment of the severity of Ramos's mental limitations and set forth specific reasons, which included, among other things, the fact that no treating mental health provider stated that plaintiff had marked or extreme limitations in mental functions. (*Id.* at 23.) In her motion for summary judgment, Ramos complained that the ALJ improperly discounted the opinion of Dr. Laviolette; however, the magistrate judge found that plaintiff's contention lacked merit. (Rep. & Recom. 10 n. 10.) Ramos has not objected to the magistrate judge's determination to credit the ALJ's assessment of Dr. Laviolette, thus I adopt that portion of the report and recommendation.

However, Ramos complains that the ALJ's conclusion that Ramos could perform certain daily activities with "assistance" compels a finding that she suffered from marked, not mild, limitation in this area. Again, "[t]he quality of these activities is judged by their independence, appropriateness, and effectiveness." 20 C.F.R. pt. 404, subpt. P, app. 1 § 12.00(C)(1). While Ramos required some assistance with some activities, the record does not reflect that she had a "serious difficulty performing [her daily activities] without direct supervision, or in a suitable manner, or on a consistent useful, routine basis, or without undue interruptions or distractions." *Id.* In this case, the ALJ carefully reviewed testimony about Ramos's daily activities in conjunction with her medical records that corroborate Dr. Kowalski's assessment that Ramos could perform a variety of household chores. (R. 190.) While Ramos testified that on some days her energy levels were low and that she had some trouble completing tasks and remembering to pay her bills or to take her medications on time, on other days, she woke up feeling energetic, cleaned, prepared her own meals, and enjoyed watching Spanish television. (*Id.* at 353–59.) While she testified that she had no friends and did not speak to her husband at home (*id.* at 354), she reported to Dr. Laviolette that she coped with her depression with the help of her husband. (*Id.*) Ramos also revealed to Dr. Laviolette that she got along with her children and sometimes with her neighbors, that she had two friends, and that she had never been fired. (*Id.* at 184.) Thus, substantial evidence supports the ALJ's determination that Ramos exhibited a mild limitation in the area of activities of daily living.

Ramos also objects to the ALJ's treatment of her most recent medical records. She avers that the ALJ "rejected" her 2005 progress treatment notes. (Obj.'s to Rep. & Recom. 6.) [11] Contrary to Ramos's assertion, it is clear from the ALJ's opinion that the she considered Ramos's medical records in their entirety as part of her analysis. Despite the ALJ's observation that the recent therapy sessions took place after Ramos filed for SSI, the ALJ specifically cited the 2005 records to support her finding that Ramos's consultations and ongoing treatment, as a whole, were " 'routine' " and "conservative" in nature (*id.* at 26 (citing, e.g., "Ex. C–12F," or R. 323–31)). As the ALJ noted, Ramos's records did not record any "psychiatric emergency room treatments, in-patient hospitalizations, critical active treatment, or significant office care other than for routine maintenance." (*Id.* at 26.) Additionally, the ALJ pointed out that none of Ramos's treating medical sources reported any "claimant actions or medical events indicating or suggesting market or extreme psychological restrictions concerning the claimant's ability to perform activities of daily living, to sustain social functioning, or to maintain concentration or focus of attention." (*Id.*)

Indeed, Ramos's 2005 records, which the ALJ did not specifically exclude from her analysis, corroborate the above findings and are consistent with her earlier mental health treatment. In late 2001, the Nueva Vida evaluating psychiatrist diagnosed Ramos with major depressive disorder and recommended counseling and medication. (R. 336.) Notably, Ramos did not receive mental health treatment in 2004. While her January 2005 APM evaluation again

---

11. The ALJ stated: "While more recent psychotherapy sessions occur more frequently, and are of longer, one hour duration, the Administrative Law Judge also notes that these more recent and longer therapy sessions all occur in 2005, following the claimant's filing date for disability payments." (R. 23 (citation omitted).)

contained a diagnosis of major depressive disorder (*id.* at 227), her 2005 treatment did not vary appreciably from her earlier treatment. Ramos's 2005 treatment plans included making sure all her medication was taken as prescribed and with food (*id.* at 328); determining which medication offered the fewest side effects (*id.* at 330); and continuing psychotherapy (*id.* at 328). Thus, Ramos's progress treatment notes, viewed in their entirety, support the ALJ's assessment that Ramos received routine consultations and conservative psychiatric treatment in late 2001 to late 2003 and in the first months of 2005.

■ Finally, Ramos's claim that her GAF score of 52 supports a finding that she had a marked mental limitation because it is close to 50 is also without merit.[12] "Because a GAF constitutes medical evidence accepted and relied upon by a medical source, it should be addressed by an ALJ in making a determination regarding a claimant's disability." *Santiago–Rivera v. Barnhart*, CIV.A. No. 05-56989, 2006 WL 2794189, at *9, 2006 U.S. Dist. LEXIS 69559, at *30 (E.D.Pa. Sept. 26, 2006). Here, the ALJ did not fail to address Ramos's score of 52, defined by the American Psychiatric Association as "no more than a moderate degree of symptomalogy," which supported her conclusion that Ramos did not meet the listing requirements of § 12.04. (R. 26.) Further, Ramos cites no cases or regulations suggesting that a GAF score of 52 is determinative of disability because it is close to 50, which denotes "serious" symptoms. Clinicians use a GAF scale to identify an individuals' overall level of functioning, and a lower score "may indicate problems that do not necessarily relate to

the ability to hold a job." *Lopez v. Barnhart*, 78 Fed.Appx. 675, 678 (10th Cir. 2003) (not precedential). Additionally, neither the regulations nor case law requires an ALJ to determine a claimant's disability based solely on her GAF score. *Dawson v. Barnhart*, No. 7:05CV00314, 2006 WL 982005, at *2, 2006 U.S. Dist. LEXIS 18783, at *6 (W.D.Va. Apr. 11, 2006); *see Howard v. Comm'r of Soc. Sec.* 276 F.3d 235, 241 (6th Cir.2002) (stating, in the context of a residual functional capacity determination, "[w]hile a GAF score may be of considerable help to the ALJ in formulating the RFC, it is not essential to the RFC's accuracy"). Thus, Ramos's GAF score alone does not compel a marked finding as it is clear from the ALJ's decision that the GAF score is but one piece of evidence that the ALJ considered in her analysis of Ramos's limitations. *See Lozada v. Barnhart*, 331 F.Supp.2d 325, 334 (E.D.Pa.2004) (finding that plaintiff's GAF scores of 45 and 35–40 during her hospitalization did not alter the analysis of the severity and functional limitations of plaintiff's depression and anxiety because substantial evidence supported the ALJ's conclusion that plaintiff had only mild restriction in activities of daily living, moderate difficulties with social functioning, and moderate difficulties in maintaining concentration).

### B. Whether Ramos Retained the Residual Functional Capacity to Perform Some Light Work with Certain Restrictions

In her second objection, Ramos asserts that substantial evidence does not support the ALJ's residual functional capacity determination "that Ms. Ramos['s] shoulder

---

**12.** A GAF score in the range of 41–50 indicates "serious symptoms (e.g. suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g. no friends, unable to keep a job)." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32.

impairment only resulted in a limitation on overhead reaching." (Obj.'s to Rep. & Recom. 1, 9–15.) Here, the ALJ concluded that Ramos could perform a light level exertional work with the following pertinent restrictions: "The claimant is unable to perform postural activities with more than occasional regularity; should avoid reaching above shoulder level with her left arm." (R. 30–31.) The report and recommendation found that substantial evidence supports the ALJ's determination regarding Ramos's residual functional capacity. This court agrees.

In assessing residual functional capacity, an ALJ determines whether the claimant's impairments cause physical and mental limitations that affect what a claimant can do in a work setting. 20 C.F.R. § 416.945 ("Your residual functional capacity is the most you can still do despite your limitations."). An ALJ must consider subjective allegations of pain. 20 C.F.R. § 416.929(b); *Hartranft*, 181 F.3d at 362; *see also* SSR 96–7p. This analysis "obviously requires the ALJ to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it." *Hartranft*, 181 F.3d at 362. However, the Third Circuit has emphasized that the "ALJ must give serious consideration to a claimant's subjective complaints of pain, even where those complaints are not supported by objective evidence." *Mason v. Shalala*, 994 F.2d 1058, 1067 (3d Cir.1993).

Here, the ALJ's determination of a light level residual functional capacity, with a limitation to avoid reaching overhead, is supported by substantial evidence. The ALJ explained her finding with the following objective evidence. First, and significantly, the ALJ noted "no treating medical source has ever offered an opinion concerning the claimant's specific physical limitations." (R. 27.) Second, a left shoulder radiographic test performed on August 5, 2004 revealed signs of calcification and/or spur formation, but no evidence of fracture or dislocations (*Id.* at 25, 320.) Third, even though Ramos had been prescribed physical therapy, she attended only fourteen sessions in 2003 and she did not complete her physical therapy regimen. (*Id.* at 25, 155.) Fourth, Dr. Abdollahian's consultative examination report stated, according to the ALJ, that Ramos "was able to move all joints 'very well', exhibited full ranges of motion [albeit with complaints of shoulder pain], revealed no signs of motor, reflex or sensory deficits, and showed no signs of muscle atrophy." (*Id.* at 25, 179.) Fifth, the ALJ stated that Dr. Abdollahian's report showed a functional capacity that "was essential within normal limits, with full [5/5] grip strength, and that despite her complains, the claimant was able to bend and pick items up off the floor." (*Id.* at 28, 179.) Sixth, Ramos's medical records provided by her primary care physician at APM did not reflect complaints of "bilateral hand weakness" and contained complaints of left shoulder pain only. (*Id.* at 28, 214–318.) Seventh, according to the ALJ, an orthopedic specialist found a "mildly weak left shoulder with decreased range of motion" that was treated with splints and injections. (*Id.* at 28, 320–22.) Eighth, the ALJ further observed that Ramos's physical progress notes show her consultations and treatments were "routine" and "conservative" in nature. (*Id.* at 28.) Last, the ALJ noted that medical sources "failed to note signs of significant focal or neurological deficits, diminished ranges of motion, muscle atrophy or weakness, motor disruption, or sensory or reflex abnormalities to the degree as alleged by the claimant, and the medical record reveals no notable evidence of physical compromise which would affect the claimant's ability to

lift, carry, stand, walk, or sit to the degree as alleged." (*Id.* at 26.)

Ramos, however, claims the ALJ violated the *Cotter* doctrine by failing to evaluate all relevant evidence. It is clear from her analysis that the ALJ reviewed Ramos's medical record in its entirety, and as noted above, substantial evidence supports her decision with regard to Ramos's residual functional capacity.[13] The ALJ weighed the aforementioned objective evidence against Ramos's subjective complaints of shoulder pain, as mandated by the regulations and Third Circuit precedent, and found that Ramos was not fully credible on the severity of her impairments and their impact on her ability to work. (R. 26.) The magistrate judge agreed with the ALJ's credibility finding, and notably, Ramos has not objected to the magistrate judge's determination.

▆ Ramos also asserts that the ALJ's decision should be reversed because the VE testified that even if Ramos "could reach frequently but not constantly, she would not be able to perform any work activity." (Obj.'s to Rep. & Recom. 14.) However, this claim is also without merit. "A hypothetical question must reflect all of a claimant's impairments that are supported by the record; otherwise the question is deficient and the expert's answer to it cannot be considered substantial evidence." *Chrupcala v. Heckler,* 829 F.2d 1269, 1276 (3d Cir.1987). In this case, the hypothetical that the ALJ posed to the VE accurately reflected Ramos's impairments supported by her records. (R. 360–61.) In response, the VE identified the jobs of

small parts assembler, hand packer, and stock checker as those within the limited range of work Ramos was capable of performing. (*Id.* at 361.) While the VE also testified that these jobs would not be available to an individual who could only "frequently" but not "constantly" use her left upper extremity (*id.* at 362), the ALJ was not required to credit the VE's testimony predicated on the claimant's subjective complaints that were not supported by objective medical evidence in the record. *Craigie v. Bowen,* 835 F.2d 56, 57–58 (3d Cir.1987). Thus, I agree with the magistrate judge's conclusion that the ALJ properly eliminated the additional restriction of "frequent" as opposed to "constant" reaching from her residual functional capacity determination.

Therefore, I conclude that the ALJ's finding that Ramos was not under a "disability" as defined by the Act is supported by substantial evidence.

## V.  Conclusion

For the aforementioned reasons, I conclude that the ALJ's decision denying Ramos SSI is supported by substantial evidence from the record. Therefore, I will overrule Ramos's objections and adopt the report and recommendation of Magistrate Judge Rueter. Further, I will deny Ramos's motion for summary judgment and will grant the Commissioner's motion for summary judgment.

An appropriate order follows.

---

**13.** For instance, Ramos points to three visits to Temple in July, August, and September 2002, where she complained of pain in her left hand. (R. 152–54.) However, as the magistrate judge concluded "[t]his is a case where plaintiff is able to point to some medical evidence which appears to support her claim. Under the substantial evidence test, however, 'the question is not whether we would arrive at the same decision; it is whether there is substantial evidence supporting the Commissioner's Decision. *Donatelli v. Barnhart,* 127 Fed.Appx. 626, 630 (3d Cir. 2005) (not precedential) (citing *Hartranft,* 181 F.3d at 360)." (Rep. & Recom. 16.)

## Order

AND NOW, this ⎯⎯ day of March 2007, upon consideration of the parties' cross-motions for summary judgment, and after careful and independent review of United States Magistrate Judge Thomas J. Rueter's report and recommendation and plaintiff's objections, it is hereby ORDERED that:

1. Plaintiff's objections are OVERRULED.

2. The Report of Magistrate Judge Thomas J. Rueter is APPROVED and ADOPTED.

3. Plaintiff's motion for summary judgment (styled as a Request for Review) is DENIED.

4. Defendant's motion for summary judgment (styled as a Response) is GRANTED.

5. The final decision of the Commissioner is Affirmed and Judgment is entered in favor of defendant and against plaintiff.